UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCHERMAINE NAPHIER,

                Plaintiff,                              Case Number 11-13754

v.                                               Honorable David M. Lawson

COUNTY OF GENESEE, OFFICER WINSTON,
PRISON HEALTH SERVICES, INC.,
C. CONLEY, RICHARD BROOKS, and
DENNIS LLOYD,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, a Type-I diabetic who takes 100 units of insulin three times per day, was jailed by a judge in Flint, Michigan for an outstanding traffic ticket. During the twenty-four hours the plaintiff spent in the Genesee County jail, she was not given access to the insulin that was in her purse, she was not seen by a doctor despite exhibiting symptoms of physical distress, and she was given a single dose of 15 units of insulin. The next day, after bail was posted, the plaintiff was admitted to a hospital suffering from ketoacidosis, where she spent the next five days, three in the intensive care unit. She brings this case under 42 U.S.C. § 1983 and state law alleging that the jailers and medical personnel were deliberately indifferent to her serious medical needs and therefore violated her constitutional rights. The defendants have moved for summary judgment alleging that the plaintiff has not generated sufficient facts to support her claims, although none of them have raised a qualified immunity argument. The Court heard oral argument on the motions on November 19, 2012, and now finds that the plaintiff has offered evidence sufficient to create a question of fact

as to the liability of defendants Robert Winston and Cheryl Conley, but not as to the other defendants. Therefore, the motions for summary judgment will be granted in part and denied in part.

## I.

According to the discovery items filed in this case, plaintiff Schermaine Naphier was diagnosed with Type-I diabetes at age seven and takes insulin daily to control her blood sugar. Her doctors have changed her dosage and medication regularly over the years in order to control her irregular blood sugar levels. She has had complications relating to diabetes in the past when she was pregnant. Naphier frequently monitored her blood sugar level, checking it at least four times a day using her own glucometer, and more if needed. In 2008 and 2009, Naphier was hospitalized several times for diabetic ketoacidosis while living in Illinois. Diabetic ketoacidosis is a condition "where the patient is unable to get glucose, which is [the body's] energy source, from the blood vessels into the cells for proper metabolism." Resp. to Mot. for Summ. J., Ex. H, Lloyd dep. at 36. "Ketoacidosis in any insulin dependent diabetic is of concern," and "can be a life threatening situation." *Id.* at 36-38.

Naphier moved to Illinois in 2007, but returned to Michigan in 2009 to care for her sick grandmother. When she returned, she was told that she had an outstanding warrant in Genesee County for a 2005 traffic ticket. On August 26, 2009, she went to the 68th District Court in Flint, Michigan to appear before a judge on her warrant for driving with a suspended license, and the judge ordered Naphier detained until she could post the bond on her ticket. She was taken to the Genesee County jail at around 12:45 p.m. that day. When she arrived the jail, Naphier did not feel sick; she had last taken her insulin around 8:30 or 9:00 a.m.

On the "Pre-Booking Health Questionnaire," completed by jail officer Richard Brooks on August 26, 2009 at "12 Noon," Naphier disclosed that she was diabetic and was taking 100 units of insulin three times a day from a "Humalog Pen," which she had brought with her in her purse. From the time she arrived around 1:00 p.m., Naphier was shackled to a bench in the booking area awaiting processing. At 3:40 p.m., the booking log records that "Nurse Jeannette" visited Naphier in the booking area, and Naphier recalls telling "a lady" that she was a diabetic and needed to take insulin. Naphier then told the lady that she felt "nauseous," "extremely sick," and wanted to go to the hospital. According to Naphier, she was visibly shaking, sweating, and crying at the time. Naphier also vomited while she was talking to the lady, who presumably was a jail nurse. The nurse told Naphier that jail policy was not to take inmates to the emergency room unless they were unconscious or unable to speak to medical staff. Naphier remembers talking to another nurse later when she was taken upstairs to the medical floor of the jail, but she believes that occurred the next day about thirty minutes before she was released from jail, after her grandmother paid her bond. Naphier does not recall what the nurse did or told her while on the medical floor, but she did remember getting Pepto Bismol and TUMS. When Naphier went to the medical floor, someone from the jail had to help her walk and get on the elevator because her legs felt weak. She recalled vomiting again over a floor drain while on the medical floor.

Naphier admits that she does not remember clearly how long she was at the jail, or if she spent the night. She explained that "it's like all foggy to me." Resp. to Mot. for Summ. J., Ex. A, Naphier dep. at 29. Nor does she remember getting an insulin shot while in jail. But she does remember "that [she] was horribly sick and . . . wanted to take my medicine or . . . go the hospital." *Id.* at 29-30, 47. She believes that anyone could see she was ill because, as she described herself,

she could barely stand up, was throwing up, and was sweating.  While she was in the booking area, she says she vomited several times, and one officer moved the trash can in the area closer to her so that she could throw up in it while she was shackled to the bench. Naphier remembers that someone told her that the jail would have to obtain verification from her doctor or pharmacy before she could take the medications she brought in with her.  Defendant Dennis Lloyd, an osteopathic physician who apparently works for defendant Prison Health Services, Inc. (PHS), which has a contract to provide medical services for the Genesee County jail, testified that PHS and the jail adopted the verification policy because inmates who come in often do not know what medicine they are taking, take medicine that is not prescribed, or cannot remember accurately the dosage and frequency.

Naphier remembers being given food only once while in jail, soon after she arrived.

Naphier was released from jail around noon on August 27, 2009.  When she went outside, she says that her legs gave out, and she used her cell phone to call 911.  An ambulance came for her and transported her to the Hurley Medical Center in Flint.

The Hurley Medical Center triage record reflects that Naphier was admitted at 2:51 p.m. on August 27, 2009, complaining that she felt ill and had not had her insulin for two days while in jail. Her blood sugar level was over 500 milligrams per deciliter (mg/dL).  Naphier testified that an "acceptable" blood sugar level for her was around 130 mg/dL.  Dr. Lloyd testified that fasting blood sugar should be between 120 and 140 mg/dL, and nonfasting levels 160 to 180 mg/dL, although the American Diabetes Association suggests that a normal blood sugar level in a healthy person before eating is less than 100 mg/dL.  Naphier was taken to the Hurley Medical Center intensive care unit (ICU), diagnosed with diabetic ketoacidosis, and kept for two and a half days on an insulin IV drip. On August 31, 2009, she was discharged in stable condition with a new insulin regimen.

-4-

The defendants tell a slightly different story. Defendant Cheryl Conley, a PHS employee who worked as a nurse at the Genesee County jail, staffed the second shift at the jail from 3:00 p.m. to 11:30 p.m. on August 26, 2009. Although the booking sheet on Naphier was completed earlier in the day, Conley did not collect the sheets from the booking area until 11:20 p.m. The plaintiff's diabetic condition was noted on that sheet. Conley testified that her usual practice was to pick up the booking sheets sometime between 8:30 to 10:30 p.m. when she went down to the booking area to dispense medications, but the second shift was very busy that day with only two nurses working, and she did not retrieve the sheets until 10 minutes before her shift was scheduled to end. Conley did not recall when she first became aware of Naphier's medical condition, but she testified based on her progress notes in Naphier's chart that she was called by someone in booking around 11:45 p.m. to examine the plaintiff. Conley did not recall if she looked at the booking sheet before she received the call.

When Conley examined Naphier, she used a glucometer from the medical department at the jail, which showed Naphier's blood sugar as "high." The glucometer she used did not display a numeric reading for a blood sugar level over 400 mg/dL, and the plaintiff's value pegged the instrument. Conley acknowledged that on a scale of 1 to 10, with 10 being the most serious, a blood sugar reading over 400 mg/dL would rate a "10." Conley's training on treating diabetic inmates consisted of instructions from another nurse when she was hired by PHS, and one unit of continuing education about diabetes each year as part of her nursing qualifications. When an inmate's blood sugar registered high on the glucometer, the nurses were trained and PHS policy directed them to call the doctor and ask for instructions.

Conley did not remember if Naphier told her about the insulin in her purse, or if Conley asked Naphier when she last ate or took insulin.  Conley admitted those would be important things to know when dealing with a diabetic patient.  Conley did not take Naphier's blood pressure, temperature, or other vital signs; she explained that she was more concerned with the blood sugar when she first saw Naphier.  Conley could not say whether Naphier was vomiting, shaking, or diaphoretic, but because the chart showed no such notation, Conley believed she did not observe those symptoms.  And Conley has no memory of ever trying to call a physician or pharmacy to verify the accuracy of the medications the plaintiff had with her.  Conley acknowledged, however that under PHS policy, she could not have sent Naphier to the emergency room without orders from the doctor.

Conley called Dr. Dennis Lloyd sometime around midnight.  He instructed her to give Naphier 15 units of insulin subcutaneously, check her blood sugar twice a day, and give "[i]nsulin to scale until meds are verified."  Mot. for Summ. J., Ex B at 13.  Conley gave Naphier the 15 units of insulin soon after she spoke with Dr. Lloyd, although she could not recall the exact time.  Dr. Lloyd testified that he only gave one order for 15 units of insulin.  The medical records submitted by the defendants do not show that Naphier received any insulin except the dose that Conley gave.  Dr. Lloyd never came to the jail to examine Ms. Naphier.  However, he testified that he thought the 15 units of "regular insulin" that he ordered was an appropriate amount — despite the plaintiff's prescription calling for considerably more — because her blood sugar level decreased to 160 mg/dL.

At 12:30 a.m., Nurse Etelka Thomas, the third shift nurse working at the jail that night, completed a medical intake form on the plaintiff.  Conley testified that she would have told the incoming third shift nurse about Naphier's condition, although she had no specific recollection of

doing so.  Thomas's progress note indicates that Naphier stated during the intake interview, "I don't feel good, my head hurts, my heart is beating fast, and my stomach is upset." Resp. to Mot. for Summ. J., Ex. D, Naphier Progress Notes.  Dr. Lloyd apparently was notified again and prescribed Tylenol and Pepto Bismol for the headache and stomach ache, which Thomas dispensed.  Thomas recorded that Naphier was showing no signs of distress.  On August 27, 2009, at 3:45 a.m., Nurse Thomas checked Naphier's blood sugar and it registered 160 mg/dL, which Dr. Lloyd testified was "acceptable," and indicated that the dose of insulin he ordered was effective and had brought Naphier's blood sugar down.

Dr. Lloyd acknowledged speaking to Nurse Conley sometime around 11:45 p.m. on August 26, 2009 and to Nurse Thomas shortly thereafter.  Other than those two phone calls and the orders he gave, Lloyd did not provide any treatment to the plaintiff and never examined her.  When Conley called Lloyd, she told him that Naphier was an insulin dependent diabetic, that Naphier had not taken her medication, and that the glucometer registered "high" when Conley checked Naphier's blood sugar.  Conley did not tell Lloyd that Naphier had thrown up, complained of nausea, that her stomach ached, that Naphier was shaking or sweating, or that Naphier had heartburn.  Lloyd testified that those symptoms could lead to more serious medical complications in a diabetic patient, but that they would not have changed his initial course of action.  Lloyd testified that at the time he spoke with Conley, based on the information he received, he would have assessed Naphier at 5 or 6 on a scale of 1 to 10, with 10 being the most serious medical condition.  At the time Naphier left the jail and went to the hospital, he would have rated her at 9 or 10.

Lloyd did not recall whether Conley told him how often and at what dose Naphier took insulin each day.  Lloyd says he was never told that Naphier had a history of ketoacidosis, but had

he known that, he would have viewed symptoms like nausea, sweating, shaking, and vomiting more seriously, because ketoacidosis can be life-threatening. Lloyd testified that based on the records in the plaintiff's chart, Naphier's vital signs were only taken once during her stay at the jail, but that he "would like vital signs to be taken very frequently in patients who are ill," and would expect that at a minimum they would have been taken "[e]very time she was seen by a nurse." Resp. to Mot. for Summ. J., Ex. H, Lloyd dep. at 35-36. Interpreting the forms in Naphier's chart, Lloyd testified that Naphier was placed in an observation cell on the medical floor at some point, so that medical staff could monitor her condition. The observation cell form indicates that whoever completed it "[o]bserved inmate [twice] sticking finger down her throat to vomit," Mot. for Summ. J., Ex. 9; and Naphier admitted that while in the medical unit she stuck her finger down her throat to vomit, because she felt like she needed to throw up and thought that vomiting would make her feel better, Resp. to Mot. for Summ. J., Ex. A, Naphier dep. at 81-82.

Defendant Robert Winston was a jail officer who worked second shift at the jail on August 26, 2009. He was working in the property division at the time, where inmates are "dressed in" or released from the jail. Winston completed the booking screening form on Naphier at 7:55 p.m. on August 26, 2009, on which he recorded that she was diabetic, was taking insulin, and was on a special diet for her diabetes. Winston testified that it was "quite common" for an inmate to remain in the booking area and for the screening form not to be completed for up to six hours after arrival. Once the form is completed, it is printed, the inmate reviews it, and then the form is placed in a tray in the booking area for medical to pick up later. It took Winston about two minutes to complete the screening form on the computer. He had no other interaction with Naphier other than completing the receiving screening form.

-8-

Winston attended a four-week jail academy where part of his training covered how to handle inmates with medical emergencies.  Officers at the jail also had to be familiar with jail policies, and supervisors would circulate changes to the policies for officers to read and initial, showing that they had read them.

Naphier filed her complaint in this Court on August 26, 2011, which was amended on February 15, 2012.  The amended complaint alleges that the defendants were deliberately indifferent to her serious medical needs when they denied her the necessary dosages of her insulin, and that the County engaged in a custom or practice of violating constitutional obligations that prohibit infliction of cruel and unusual punishment in the way it trained its jail officers in dealing with the provision of medical care to jail inmates.  The amended complaint also alleges that the defendants were grossly negligent in their care of the plaintiff while she was in their custody.  In addition to Genesee County, the amended complaint names as defendants jail officers Richard Brooks and Robert Winston, Prison Health Services, Inc., Dr. Dennis Lloyd, and nurse Cheryl Conley.  After discovery was completed, the defendants filed their motions for summary judgment.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed.R.Civ.P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.' " *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (internal quotation marks omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if

-10-

its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

## A.  Genesee County defendants

In counts I, II, and III of the amended complaint, the plaintiff alleges that the defendants violated her rights protected by the Eighth Amendment. The Eighth Amended prohibits the infliction of cruel and unusual punishment upon those convicted of crime. The Genesee County defendants argue that there can be no Eighth Amendment violation because Naphier was not serving a sentence; she merely was detained until she posted bond. The defendants are correct. "The Eighth Amendment does not apply to pretrial detainees." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). Because counts I through III are based solely on the Eighth Amendment, they must be dismissed.

However, in count V of the amended complaint, the plaintiff has asserted the same claims against the defendants under the Fourteenth Amendment. It is well established that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that

-11-

. . . are enjoyed by convicted prisoners," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), and the Fourteenth Amendment confers upon pretrial detainees a right to adequate medical treatment that is "analogous to the Eighth Amendment rights of prisoners." *Watkins*, 273 F.3d at 686; *see also Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). The Court, therefore, will analyze the plaintiff's claims on that basis.

The Genesee defendants also argue that even under the Fourteenth Amendment, the plaintiff cannot show that they were deliberately indifferent to her medical needs or that her medical complications flowed from a policy, custom, or practice that the jail administration employed. The plaintiff contends that she informed jail personnel of her diabetic condition and need for medication as soon as she arrived, and they ignored her.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The state's failure to provide necessary medical care to prisoners can establish a cause of action under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1986).

The Fourteenth Amendment, by extension of Eighth Amendment jurisprudence, protects pretrial detainees against the deliberate indifference to their serious medical needs by their jailors. *Farmer v. Brennan*, 511 U.S. 825 (1994). Under that amendment, "[t]he test to determine whether [a defendant] acted with 'deliberate indifference' has an objective and subjective component." *Napier*, 238 F.3d at 742. To succeed on a claim of deliberate indifference, the plaintiff must offer

-12-

evidence on both components: the objective serious medical need, and the defendant's subjective deliberate indifference to it.  *Farmer*, 511 U.S. at 834.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).  "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 707 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).  The Sixth Circuit further noted that

> [a]lthough the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by "the usual ways." *Farmer*, 511 U.S. at 842.  Thus, the Supreme Court noted that it was permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge. *Id.* at 842.  Moreover, the Court warned, a prison official may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n.8.

*Id.* at 703.

Deliberate indifference is the "equivalent of recklessly disregarding [a substantial risk of serious harm to a prisoner]." *Dominguez*, 555 F.3d at 550 (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 540 (6th Cir. 2008)).  However, the Sixth Circuit also held that "less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).  In particular, the Sixth Circuit endorsed the standard of "grossly inadequate medical care," under which medical treatment is "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental

-13-

fairness.' " *Id.* at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)).

Differences in judgment between an inmate and prison medical personnel regarding appropriate

medical diagnoses or treatment are insufficient to state a deliberate indifference claim. *Sanderfer*

*v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995). "Deliberate indifference is not mere negligence,"

*Watkins*, 273 F.3d at 686, and mere allegations of malpractice are insufficient to state a claim,

*Estelle*, 429 U.S. at 106.

The plaintiff has satisfied the objective component of her deliberate indifference claim

against the defendants. The plaintiff was an insulin-dependent diabetic. It takes no medical training

to understand that when a diabetic is deprived of her insulin, grave consequences follow. That fact

might even be relegated to the category of common knowledge.

Moreover, even accepting all of the defendants' testimony as true, it is undisputed that

Naphier informed at least five employees of the jail and PHS that she was diabetic, took insulin

daily, and needed either to take insulin or get medical treatment for her diabetes. First, when she

arrived at the jail at noon, Naphier told officer Richard Brooks about her diabetes and that she took

insulin three times a day, which was recorded on the "pre-booking health questionnaire" form.

Second, sometime around 3:40 p.m., Naphier told "Nurse Jeanette" about her condition and her need

for insulin when that nurse came down to the booking area to examine her. Third, sometime around

8 p.m., Naphier told officer Robert Winston about her diabetes and that she took insulin daily, which

Winston recorded on the computer screening form, and which nurse Cheryl Conley testified that she

later picked up and reviewed. Fourth, around 11:45 p.m., Naphier told Conley about her diabetes

and need for insulin, and Conley checked Naphier's blood sugar and found that it read over 400

mg/dL (where a reading somewhere below 100 mg/dL in healthy individuals would have been

-14-

"normal"). Conley then called Dr. Lloyd, who ordered Conley to administer only 15 units of insulin, check Naphier's blood sugar twice a day, and administer "insulin to scale" until Naphier's regular medication was verified. Conley also noted in Naphier's chart that she "could not verify" Naphier's prescribed medication, from which it is fair to infer that Naphier gave Conley at least some information that she needed to take insulin several times a day. Fifth, around 12:30 a.m., Nurse Etelka Thomas completed the "medical intake" on Naphier on the medical floor, and Conley testified that she would have informed Thomas of Naphier's condition before leaving. Although Thomas noted in the chart that Naphier showed no "signs or symptoms" of distress, Naphier testified that she again asked for her medication or to be taken to the hospital while on the medical floor, and banged on the window of the observation cell to get the attention of jail staff, who ignored her. Finally, Naphier also testified that throughout her stay at the jail, from around 3:40 p.m. until the time she left, she was visibly shaking, sweating, and frequently vomited in clear view of both jail officers and medical staff.

In *Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005), the Sixth Circuit reversed a grant of summary judgment on facts congruent to those of the present case. The Sixth Circuit held that the plaintiff had proved an objectively serious medical need where (1) she was an insulin-dependent diabetic; (2) she was held overnight as a pretrial detainee in a city jail; (3) upon arrival at the jail, the plaintiff informed one officer she was late for her insulin dosage; (4) the officer stated that the jail would not administer insulin, but the plaintiff could have it delivered and take it herself (that apparently never happened, and the plaintiff did not use the active phone in her cell to make any calls during her stay); (5) the plaintiff asked for a transfer to a nearby county jail, which she knew from past experience would supply insulin, but the transfer was denied; (6) during the

-15-

night, the plaintiff told another officer about her need for insulin, who only replied he would "see what he could do"; and (7) the next morning, after plaintiff told a detective who interrogated her about her medical needs, the detective called for emergency medical treatment. As a result of the insulin deprivation, the plaintiff in *Garretson* suffered symptoms of uncontrolled blood sugar during her night in jail and was hospitalized for diabetic ketoacidosis when she was finally taken for medical treatment. The Sixth Circuit found the objectively serious medical need established even though, at the time medical help was called in the morning, the plaintiff "was not exhibiting physical symptoms of distress." *Garretson*, 407 F.3d 794.

The jail guards, defendants Richard Brooks and Robert Winston, argue that the plaintiff has not offered evidence from which a jury could find that the subjective component of the deliberate indifference claim has been proved. Each defendant's argument must be evaluated separately.

Richard Brooks was the jail employee who completed the pre-booking screening form, which he dated "12 noon," the time the plaintiff arrived at the jail. Certainly she told him that she was a diabetic, but she also testified that when first admitted to the jail she was feeling fine and had no symptoms of diabetic distress. She informed Brooks of her condition and medication, which he recorded on the pre-booking form, as required by jail policy. There is no evidence that Brooks perceived anything more than what he recorded on the form, because Naphier admits she was not vomiting, shaking, sweating, or feeling ill when first admitted to the jail around 12:45 p.m., and there is no testimony that she was overdue for her insulin dose. Naphier therefore has not provided sufficient evidence from which a jury reasonably could conclude that Brooks perceived or disregarded any substantial risk to the plaintiff's health. Therefore, Brooks is entitled to judgment as a matter of law.

-16-

The evidence of Robert Winston's interaction with the plaintiff is different.  Winston testified that he only interacted with Naphier for about two minutes, long enough to complete the computer booking form.  However, Naphier testified that she was visibly shaking, sweating, and vomiting throughout the time that she was in the booking area, and she stated that a jail officer moved a trash can closer to her so she could vomit in it.  Winston recorded Naphier's answers to the questions about medical conditions and medication.  Although Naphier did not identify Winston as the officer who observed her fragile physical condition, there is no evidence in the record that anyone else performed that deed, and the reasonable inference that it was Winston must be drawn in favor of the plaintiff at this stage of the case.  When Winston completed the booking form at 7:45 p.m., it is undisputed that the plaintiff had been at the jail since noon and had not received any medication, or even any medical attention.  Winston knew of Naphier's medical condition, her need for medication, that she had not been provided medication, and, if the plaintiff is to be believed, that she was suffering from that deprivation.  Yet, Winston's response to what Naphier told him was limited to completing the booking form, noting Naphier's medical conditions and medication, printing the form for Naphier to review, and placing the form in the basket provided in booking where medical staff would find it, but not until several hours later.

A jury could reasonably conclude that defendant Winston perceived and disregarded a substantial risk to Naphier's health, and therefore he was deliberately indifferent to the plaintiff's serious medical needs.

Genesee County argues that Naphier cannot prove that any policy, custom, or practice adopted by the jail led to the harm she alleges.  It argues that jail officers attend a four-week jail academy, which includes training on how to handle inmate medical emergencies, that deputies

-17-

attend periodic refresher training, and that deputies are required to review and be familiar with updates to jail policies and medical updates from PHS. The county also argues that besides the academy training, deputies are supervised by command staff on every shift and that new employees go through a probation period during which they are closely supervised. As evidence that it did in fact adopt effective policies to deal with inmate medical needs, the county points to its policies that require (1) completion of the pre-booking screening form; (2) completion of the booking screening form on the computer; (3) review of the screening forms by PHS medical staff; (4) "medical intake" exams by medical staff to detect and address any medical issues not caught during screening; and (5) that booking staff call medical in response to inmate complaints during booking and screening.

The County cannot be held liable under 42 U.S.C. § 1983 merely for the acts of its employees. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010). A constitutional claim against a municipality under section 1983 must be based on the County's own conduct, meaning that it must spring from its official policies, customs or practices. *Monell*, 436 U.S. at 691. The plaintiff's only response to the County's arguments is to assert that the County failed to train its jail guards adequately to deal with the medical needs of inmates.

A municipality may be held liable for a constitutional violation based on the failure to train its employees if (1) "the failure to train amounts to deliberate indifference to the rights of persons with whom the police [or other municipal employees] come into contact"; and (2) "the deficiency in training actually caused the police officers' [or other municipal employees'] indifference to [the plaintiff's] medical needs." *City of Canton v. Harris*, 489 U.S. 378, 388, 391 (1989); *see also Ellis*

-18-

*ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (2006) (explaining that, to succeed on a failure-to-train claim, the plaintiff must prove "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury").

"In resolving the issue of [the municipality's] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91.  Failure to train encompasses claims dealing with failure to adopt policies. *See Blackmore*, 390 F.3d at 900; *Howard v. Calhoun Cnty.*, 148 F. Supp. 2d 883, 891 (W.D. Mich. 2001).

The only evidence cited by the plaintiff on this issue are two complaints made against defendant Winston by other inmates — neither of which related to furnishing medical care to diabetics — and an apparent lack of performance reviews documented in Winston's personal files. That is not enough.  Defendant Winston's response to the plaintiff's condition may have been callously indifferent, but the plaintiff has not demonstrated how that indifference was due to the County's training regimen for jail personnel.  The plaintiff has not pointed to any evidence suggesting that the County was on notice that its orientation of jail personnel to medical needs of inmates was unsatisfactory.  And the plaintiff has not argued that any other policy or custom adopted by the jail led to her injuries.  Perhaps the jail's practice of allowing booking forms to languish in the "in box" for several hours, despite information documenting the need for medication, might not withstand scrutiny.  But the plaintiff has not argued that deficiency, and it is not for the Court to

-19-

make her case.  In any event, the plaintiff has not presented a theory of liability against Genesee County supported by the evidence that warrants a trial, and the County is entitled to judgment as a matter of law on the section 1983 claim.

The plaintiff also asserts gross negligence claims against the Genesee defendants. Michigan's governmental tort immunity statute allows suits against state and local government employees acting within the scope of their employment only for gross negligence "that is *the* proximate cause of the injury or damage.  Mich. Comp. Laws § 691.1407(2)(c) (emphasis added). "Gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  *Id.* at 691.1407(7)(a)  "*The* proximate cause" has been defined by the Michigan Supreme Court to mean "the one most immediate, efficient, and direct cause of the [plaintiff]s' injuries."  *Robinson v. City of Detroit*, 462 Mich. 439, 445-46, 613 N.W.2d 307, 311 (2000).  This phrase cannot "mean anything other than the sole proximate cause."  *Smith v. County of Lenawee*, 600 F.3d 686, 691 (6th Cir. 2010).

The plaintiff has not offered evidence that defendant Brooks engaged in conduct falling within the statutory definition of gross negligence, but she has offered sufficient evidence of defendant Winston's gross negligence.  Although there may be some question whether Winston's conduct was the sole cause of the plaintiff's injuries, a "[p]laintiff can plead in the alternative," and where only one party can be *the* proximate cause of the injuries, "[t]he identity of that party is up to a jury to decide."  *Smith v. County of Lenawee*, 2012 WL 5861811, 13 (6th Cir. Nov. 20, 2012).

### B.  Prison Health Services defendants

The PHS defendants argue that (1) Naphier cannot show deliberate indifference or gross negligence as to nurse Cheryl Conley, because the record shows that she responded to the call about

Naphier's distress, examined her and tested her blood sugar, called Dr. Lloyd as required by jail policy, and followed his orders to give Naphier insulin to lower her blood sugar; (2) Naphier cannot show deliberate indifference or gross negligence as to Dr. Lloyd, because he did nothing more than respond appropriately to two telephone contacts from two jail nurses, issuing medically reasonable orders in response to the information that nurses gave him; and (3) Naphier cannot satisfy the *Monell* standard for deliberate indifference against PHS, because she has shown no proof of a pattern of repeated conduct by PHS employees sufficient to prove a failure to supervise or train.  The same standards discussed above apply to these defendants.  It is well settled that private medical providers under contract to provide medical services to jail inmates act under color of law and are subject to suit under section 1983.  *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (citing *West v. Atkins*, 487 U.S. 42 (1988)).

Despite defendant Conley's testimony that she called Dr. Lloyd and gave insulin to Naphier in response to his order, a jury reasonably could conclude that Conley subjectively perceived a substantial risk to Naphier's health and disregarded that risk.  It is true that if the jury believes Conley's testimony that she was ordered to administer insulin and did so, that she communicated Naphier's status to the incoming third shift nurse, and that she had no interaction with Naphier after giving the insulin, then it reasonably could conclude that Conley tried to address Naphier's condition with appropriate medical care and did not disregard any risk to Naphier's health.  Even if a reasonable nurse would have done more than Conley did, mere negligence cannot suffice to prove deliberate indifference.  However, if the jury believes Naphier's testimony that she did not receive any insulin while in jail, or that Conley failed to report that the plaintiff had been prescribed 100 units of insulin three times pre day, or that she failed to take Naphier's vital signs (which may have

-21-

provided additional objective indication of her distress), or that she failed to pass on to Dr. Lloyd the information describing the plaintiff's physical distress, or that Conley did not try to verify Naphier's prescription for the medication she actually had with her, then the jury reasonably could conclude that Conley knew of Naphier's serious medical condition and was ordered to give treatment, yet failed to do so. Because there remains a genuine issue of material fact as to whether Naphier actually received any insulin, Conley is not entitled to judgment as a matter of law on the claim of deliberate indifference.

The case against defendant Dennis Lloyd presents a closer call. Dr. Lloyd never came to the jail, never examined the plaintiff, and essentially phoned in his treatment. He argues that the evidence does not support the objective component of the deliberate indifference claim against him because he was never told about any of Naphier's visible symptoms, her prescribed insulin dosage schedule, or her history of diabetic ketoacidosis. However, the record also fails to show that Dr. Lloyd even made inquiry of any of that historical data, as one might expect a reasonable physician to do. Lloyd testified that Conley told Lloyd she had an insulin dependent diabetic patient who had not received her insulin and had a blood sugar level that registered over 400 mg/dL on the glucometer, nothing more. The plaintiff has not offered any contradictory evidence. Lloyd testified that even if he had been told about Naphier's visible symptoms, that information would not have changed his medical decision to order 15 units of insulin, which he judged based on his experience to be an appropriate amount to bring Naphier's blood sugar down to a "reasonable" level. The plaintiff has not offered any expert evidence that Lloyd's approach to the plaintiff's condition was unreasonable, or that criticized the prescription of 15 units of insulin to a patient who was taking 100

-22-

units three times per day and had been deprived of all medication, and whom the doctor neglected to examine.

Ironically, Dr. Lloyd's use of his ignorance as a shield from liability is effective where the plaintiff must show that the doctor actually perceived a serious medical condition and chose to ignore it. Because, as the defendants point out, Naphier has retained no medical expert, she has offered nothing to rebut the testimony by Lloyd that, based on the information he had at the time, he made medically reasonable orders for Naphier's care. Naphier offers nothing to rebut the testimony that Lloyd had no interaction regarding Naphier other than the two telephone calls from nurses Conley and Thomas, and the resulting orders that he gave them. Naphier admits she never saw Lloyd in person, and even stated in her deposition that she did not know who he was.

Because she offers nothing to establish that Lloyd "perceived" anything other than what he testified Conley told him over the phone, and offers no testimony to rebut Lloyd's evidence that his response to that information was medically reasonable, a jury could not conclude reasonably that Dr. Lloyd subjectively perceived and disregarded a substantial risk to Naphier's health. Therefore, he is entitled to judgment as a matter of law.

The plaintiff's response to PHS's argument mimics her response to the County's similar argument: that PHS failed adequately to train its personnel. Once again, Naphier has offered no evidence to show a systematic or pervasive failure to train or supervise employees by Prison Health Services. Even accepting all of Naphier's alleged facts as true, she has shown at most that Cheryl Conley might have received less training than she deems reasonable for jail nurses who may have to deal with diabetic inmates. Naphier does not rebut Conley's testimony that she received at least one annual unit of continuing education training on diabetes. Naphier points out that Conley

-23-

testified that she did not know what blood sugar level would require a diabetic patient to go to the emergency room. However, at most that evidence establishes that one jail nurse was possibly undertrained or poorly supervised. Naphier offers nothing to establish a pervasive failure to train or policy of not training and supervising employees by PHS.

Naphier also cannot establish, on the record she offers, any "policy" or "custom" of delaying medical treatment. She does not dispute the testimony by Conley that regardless of how long medical staff waited to pick up screening forms, if an inmate was in medical distress, the booking officers would call medical staff and have someone come down to see the inmate. According to Naphier's own testimony, PHS employees followed that policy at least once during her stay, when "Nurse Jeanette" came down to see Naphier at 3:40 p.m. There is no evidence that the "policy" or "custom" of having booking staff leave forms in the medical basket in booking, and having nurses come down to pick those forms up during evening medication rounds, was the "moving force" behind the harm that Naphier suffered.

The plaintiff cannot establish liability against defendant PHS under the standard required by *Monell*; therefore, that defendant is entitled to judgment in its favor as a matter of law.

As with the Genesee defendants, the plaintiff has alleged gross negligence against the PHS defendants. Only the claim against defendant Conley can proceed. The plaintiff has not offered evidence beyond ordinary negligence against Dr. Lloyd. Conley argues that the plaintiff's state law claim against her is nothing more than a disguised medical malpractice claim, and that the claim must be dismissed because she has failed to abide by the pre-suit and pleading requirements prescribed by state law. However, most federal courts that have confronted prisoners' deliberate indifference claims under the state governmental tort liability law have not required the plaintiffs

-24-

to abide by the requirements of the medical malpractice statutes. *See, e.g., Hagopian v. Smith*, No. 05-74025, 2008 WL 3539256, at *5 (E.D. Mich. Aug. 12, 2008) (refusing to characterize the plaintiff's claims as the ones sounding in medical malpractice and casting them as alleging violations of constitutional rights); *Beedle v. Doane*, No. 05-70430, 2005 WL 1345527, at *4-5 (E.D. Mich. May 12, 2005) (distinguishing medical malpractice claim from a claim under the governmental tort liability law and observing that "[t]here is nothing in the language of either the GTLA or [Mich. Comp. Laws] § 600.2169 *et seq.* providing that the notice of intent to sue and affidavit of merit requirements of the latter apply to a gross negligence claim brought under the former by an inmate"). The reasoning of those cases is sound, and the Court adopts it here.

III.

The Court concludes that the plaintiff cannot sustain a claim against any of the defendants based on a violation of her rights under the Eighth Amendment. However, the plaintiff has offered enough evidence to warrant a jury trial as to the liability of defendants Robert Winston and Cheryl Conley. The other defendants are entitled to judgment in their favor on all counts of the amended complaint as a matter of law.

Accordingly, it is **ORDERED** that the defendants' motions for summary judgment [dkt. # 40, 41] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that counts I, II, and III of the amended complaint are **DISMISSED WITH PREJUDICE** as to all defendants.

It is further **ORDERED** that the entire amended complaint is **DISMISSED WITH PREJUDICE** as to defendants Genesee County, Prison Health Services, Inc., Richard Brooks, and Dennis Lloyd **ONLY**.

-25-

It is further **ORDERED** that the motions for summary judgment are **DENIED** in all other respects.

s/David M. Lawson_____
DAVID M. LAWSON
United States District Judge

Dated:   December 21, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 21, 2012.

s/Deborah R. Tofil_____
DEBORAH R. TOFIL